**LAWRENCE SYSTEMS, INC., Plaintiff-Appellee, Cross-Appellant,**

v.

**Charlotte ADELL, Trustee of the Adell Children's Funded Trust, et al., Defendants-Appellants, Cross-Appellees.**

**Nos. 81–1418, 81–1445.**

United States Court of Appeals, Sixth Circuit.

Argued Jan. 25, 1983.

Decided Oct. 13, 1983.

William J. Weinstein (argued), Weinstein, Kroll & Gordon, Southfield, Mich., for defendants-appellants, cross-appellees.

John R. Reese (argued), McCutchen, Doyle, Brown & Enersen, San Francisco, Cal., William H. Merrill, Detroit, Mich., Michael J. Gill, Isham, Lincoln & Beale, Hugh R. McCombs, Jr., Chicago, Ill., Ronald S. Holliday, Detroit, Mich., for plaintiff-appellee, cross-appellant.

Before MARTIN and KRUPANSKY, Circuit Judges, and PECK, Senior Circuit Judge.

KRUPANSKY, Circuit Judge.

Plaintiff Lawrence Systems, Inc. (Lawrence) initiated this diversity action against defendants Charlotte Adell, Trustee of the Adell Children's Funded Trust, and the Adell Children's Funded Trust (collectively Adell Trust) seeking $17,169 damages for breach of contract. Defendants counterclaimed seeking damages in the amount of $1,100,000 for breach of a fiduciary duty which allegedly accrued pursuant to the contractual relationship between Lawrence and Adell. The action was tried to the court and judgment was awarded to Lawrence in the amount of $12,595. Both parties appealed.

The Adell family is composed of three brothers (Robert, Franklin and Marvin) and their mother, Charlótte. Each brother is married and has children. Said brothers are engaged in Adell Industries, which manufactures equipment for various automobile companies, *and* Korr's Beer Distributors, Ltd., a distributor of beer and wine. These business concerns are situated in a plant located in Novi, Michigan.

Each of the Adell brothers created a separate and distinct trust solely for the benefit of his own children. The Adell Children's Funded Trust (Adell Trust) is a partnership of these three individual trusts. This partnership enabled the trusts to operate as a single legal unit.

Milan Wineries, Inc. (Milan Wineries) was a Michigan Corporation engaged in the business of manufacturing and bottling wine products. Howard Danzig (Danzig) was the President and majority shareholder of Milan Wineries. Milan Wineries Distributors, Inc. (Milan Distributors) was a subsidiary of Milan Wineries, and was engaged in the business of distributing and selling wine in the State of Michigan; Milan Distributors distributed the products of Milan Wineries as well as the products of other wineries, including United Vinters. (When the distinction between Milan Wineries and Milan Distributors is legally irrelevant for purposes of this appeal, the term "Milan" shall be used.)

Lawrence is a California corporation engaged in the business of inventory control as an adjunct to securing commercial loans. In the action *sub judice* Lawrence was retained to control certain inventories which were to be security for a loan of $750,000 from Adell Trust to Milan. Greg Kelly (Kelly) was a sales representative for Lawrence in Michigan.

The transaction was initiated during the Spring of 1975, when Danzig, owner of Mi-

lan, commenced negotiations pursuant to which Milan Distributors sought to purchase United Beverage, a company principally owned by Robert Burns (Burns), for the sum of $750,000. Danzig, who was experiencing difficulty in financing the transaction, approached Adell Trust for a loan in the above amount. Danzig and Robert Adell were friends of long-standing; Robert trusted Danzig who had been an ordained Rabbi and Executive Director of Shaarey Zedek Synagogue, a congregation to which the Adell family members subscribed. Danzig also sought from Adell Trust certain warehouse space. In exchange for a loan of $750,000, Danzig tendered security to Adell Trust in various forms including a priority lien on all of Milan's wine inventory. The services contemplated by Lawrence, in controlling the inventories which would serve as collateral for the loan, were outlined for Adell Trust. Danzig also advised Adell Trust that time was of the essence since he had already accepted possession of and undertaken sale and distribution of United Beverages' total inventories. This was in violation of the statutes of the State of Michigan which is a "monopoly" state that prohibits transfer of wine and/or other alcoholic beverages on credit.

Shortly after Danzig approached Adell Trust for the loan of $750,000, he also applied to the National Bank of Southfield for a loan in the same amount. Southfield Bank offered to loan Danzig $375,000 upon condition that Danzig would pledge an additional $375,000 and execute and deliver a first priority lien to the bank. Southfield Bank rejected the loan application when Danzig was unable to satisfy the stipulated conditions. Adell Trust, aware of Southfield Bank's rejection of Danzig's loan application, nevertheless favorably considered advancing the entire $750,000 loan on the same date.

A meeting between Lawrence, represented by Kelly, Robert Adell on behalf of Adell Trust, and Milan, represented by Danzig, was thereafter arranged during which Kelly explained the details of a bonded warehouse inventory control concept that could be provided by Lawrence, and indicated that it was experienced in similar bonded warehouse alcoholic beverage inventory control operations.

Under Michigan law the State of Michigan exercised a statutory monopoly in the sale of distilled spirits and exclusively regulated the sale and distribution of all alcoholic beverages within its territorial boundaries. Kelly explained further that distributors within the state were statutorily required to pay cash before or upon receiving delivery of any alcoholic beverage, and credit sales were absolutely foreclosed in any form including sales by distributors to retailers. Kelly testified that the marketing of Lawrence services typically assumed the following form:

That we would issue a certificate, we would monitor the quantity and value of the inventory there, and we would do this pursuant to instructions as agreed upon between the parties. And, probably I would tell him [lender] that the borrower pays for this service so it's not an expense to the lender although the lender can pay for it if he deems so, usually how I treat that part of it that we are the eyes and ears of the lender to the extent that we would make sure that he had the valuable collateral.

Adell Trust considered the services of Lawrence a viable control of Milan's inventory which was, *inter alia,* to serve as security for the anticipated $750,000 loan from Adell Trust to Milan. Thereafter, on August 19, 1975, Milan Distributors and Lawrence executed a "Two Party Contract" styled a "Certified Inventory Control Agreement". The Two Party Agreement contemplated that Milan, Adell Trust and Lawrence would subsequently execute a Three Party Agreement. In the Two Party Agreement, Lawrence agreed to:

[I]nstall its Certified Inventory Control Service on Company's [Milan's] premises and to supervise the installation and maintenance of such inventory control records and procedures as may be required at Lawrence's discretion to permit

Lawrence to issue its Certificates to Holder.

In return, Milan agreed: (1) to furnish Lawrence with warehouse space to install the bonded warehouse; (2) to cooperate in the inventory control system and strictly adhere to and comply with instructions from Adell Trust in the withdrawal of inventory certified by Lawrence; (3) to release Lawrence from responsibility to certify and/or insure the accuracy of Milan's representations to Lawrence which the latter would rely upon in issuing Certificates and accepting delivery instructions from Adell Trust and to further release Lawrence from any responsibility to Milan for the inventory included in Milan's certification or subject to its control; (5) to assume complete responsibility for the care and condition of such inventory and for the maintenance of safe storage conditions; and (6) to remit compensation for all services performed.

The loan from Adell Trust to Milan for $750,000 was consummated on November 28, 1975.

Robert Adell testified that in committing Adell Trust to the loan he relied in part upon statements made by Kelly, Lawrence's representative, whom Adell had met on approximately three occasions prior to closing. Robert Adell further testified that Kelly had explained to Adell that Michigan was a monopoly state and that, therefore, Lawrence would have "no problem with the merchandise being paid for in or out"; Lawrence need only "watch ... the stuff when it comes in, be accountable, and [watch it] when it goes out." Robert Adell recounted that Kelly also represented that Lawrence had commenced the initial inventory count and that, although incomplete, Kelly estimated the value of the inventory would exceed $1.1 million dollars. Adell further testified that if Kelly had not made the foregoing representation as to the value of the inventory on the day of closing, then no loan would have been consummated with Milan.

The loan agreement was executed on November 28, 1975 at the Community National Bank of Pontiac (Pontiac Bank). Pursuant to the terms and conditions of the agreement: (1) Adell Trust borrowed $750,000 from Pontiac Bank securing it with a mortgage on commercial property located in Novi, Michigan, where Adell's factories were located; (2) Adell Trust thereupon loaned the $750,000 to Milan and leased to Milan a section of Adell Trust's Novi premises for the storage of the inventory; (3) Milan conveyed to Adell Trust a security interest in all assets of Milan Wineries and Milan Distributors (which security agreement provided a $1.1 million dollar cushion), and executed a first mortgage on real property wherein Milan Wineries and Milan Distributors were located, together with a promissory note executed by Danzig personally and as an officer of the Milan companies payable to Adell Trust in the amount of $750,000 with 12% per annum interest when not in default and 18% interest upon default, together with Danzig's affidavit attesting authority to execute such contracts.

Prior to the consummation of the agreement between Adell Trust, Robert Adell was advised by its counsel Gerald Case (Case) to defer execution until critical financial statements promised by Milan had been submitted for audit. Adell Trust's accountant, Gerald Rosenbloom (Rosenbloom), also disapproved the transaction. However, Robert Adell, in the face of the professional counseling by his legal consultant and accountants, nevertheless executed the loan agreement on behalf of Adell Trust since Danzig was a trusted friend and upon the belief that the inventory could be liquidated if necessary to secure the payment:

> We knew that if worse came to worse, let's say Howard [Danzig] were to unfortunately drop dead, that being we had a license, we could walk in and say, liquidate the wine and sell it to replace the loan.

Robert Burns, principal owner of United Beverage was also present at the closing of the transaction.

Also on November 28, 1975, the date upon which the loan was consummated, a "Three

Party Agreement" was simultaneously executed styled a "Certified Inventory Control Agreement" between Adell Trust, Milan and Lawrence whereby Adell Trust was required to file a financing statement and otherwise comply with the Uniform Commercial Code to protect its interest in Milan's inventory, provide instructions to Lawrence defining its approved procedure to release inventory and guarantee payment for Lawrence's services in the event Milan defaulted. Milan agreed to accept and strictly implement Adell Trust's instructions as to removing inventory and compensate Lawrence for services. Lawrence agreed to institute a "Lawrence Inventory Control Service", conduct an initial inventory audit, insure that removal of the inventory comported with Adell Trust's instructions and accept liability to Adell Trust in the event that Lawrence Inventory Certificates were incorrect. Pertinently, Lawrence agreed:

(b) To supervise and participate in the taking of an initial inventory and to deliver to [Adell Trust] its Inventory Certificate in a form acceptable to [Adell Trust] certifying to the value of the inventory on [Milans] premises *computed at values declared* by [*Milan*] and described by [Adell Trust] as being subject to its interest and subsequently to furnish to [Adell Trust] Inventory Certificates at regular intervals ...

    *    *    *    *    *    *

The contract further provided:

(5) It is agreed that Lawrence shall have *no responsibility* or liability for the contents of boxes, packages, or other containers which may be improperly marked, nor for the grade, quality, *title,* care of conditions of the commodities on which it is reporting but shall be entitled to rely on [Milan's] representations thereto. It is further agreed that *Lawrence shall have no responsibility for the validity or priority of [Adell Trust's] interest or for the values declared by [Milan] in computing the value of Inventory Certificates.*

A supplemental page of "Instruction" provided that "No goods will be considered 'received' until they have been released by the Michigan State Liquor Commission."

Kelly testified to the following at trial:

No wine could be placed in the warehouse inventory, unless a release authorizing such was issued by the Michigan Liquor Control Commission. Before such release could be obtained, evidence of payment for the wine and payment of the state taxes on the purchase of said wine had to be produced to the satisfaction of the commissioner.

A Lawrence bonded employee would oversee the placement of the incoming wine into the inventory and add the value of the inventory to the appropriate preceding inventories.

Once the wine was in the inventory, it could not leave the warehouse without Lawrence Systems knowledge. Each shipment would be physically checked by Lawrence Systems bonded employees who would keep track of what inventory was leaving the premises and the amount of the value of the wine leaving the premises would be subtracted from the running inventory.

As a check on their running inventory services, Lawrence Systems also indicated they would conduct a physical count of the inventories every so often.

The wine remained in the inventory until sold. Once sold the wine would be loaded on the truck for delivery. As the truck(s) were loaded Lawrence Systems employees would describe and count the various wines loaded and compare the wines being loaded to the shipping invoices.

The trucks when loaded at each particular retail outlet would have to receive cash or checks in return for the wine.

When the driver(s) returned in the evening to the warehouse the money from each driver would be collected and placed in bags then placed in a safe and later the money would be picked up by a Brinks armored car and deposited with the City National Bank of Pontiac.

Each driver had to account for the wine that was loaded on his vehicle. The driver

was required to return with the cash or the wine. The inventory was to be certified on a weekly basis.

All proceeds from the sale of inventory were deposited with the City National Bank of Pontiac in a "lock box" depository account. These depository account funds could be transferred to certain operating accounts maintained by Milan, or elsewhere, only upon authorization and signature of at least *two* of the following three individuals: Howard Danzig (Milan); Gerald Rosenbloom (Adell Trust's accountant); and Leslie Weisenberg (Comptroller of the Adell Manufacturing). Accordingly, Adell Trust controlled two of the signators and thereby effectively controlled the distribution of all proceeds from the sale of inventory.

It was also agreed that to further insure Adell Trust's security, there would be maintained, at all times, an aggregate sum of $1.1 million dollars between the depository account and the certified value of in-warehouse inventory.

Lawrence employed "bonded employees" to effectuate the inventory certifications. Such an employee was typically an existing employee of the company whose inventory was being secured. In December, 1975, after the loan was consummated, Lawrence employed one Mary Lou Evinger (Evinger) as a bonded employee to process inventory certifications. Evinger had been employed as Danzig's bookkeeper and secretary for sometime prior to employment by Lawrence. Danzig and Evinger, without the knowledge of either Adell Trust or Lawrence, implemented a scheme which precipitated this legal action.

Although Michigan prohibited a distributor from receiving alcoholic beverages on "credit", and mandated instead cash transactions, Evinger issued checks in payment of incoming merchandise upon its arrival at the warehouse and presented the supporting invoices and checks to Danzig for his signature. Danzig either held the checks or on occasion instructed Evinger to forward the check in payment of the merchandise that had already been incorporated into the bonded inventory. Evinger, knowing that Danzig was holding certain checks, would execute the required form certifying to the Michigan Liquor Control Commission that the beverages had actually been paid for in cash. These certifications also served as the authority to Lawrence to authorize release of the indicated inventories. Eventually, a number of Milan's checks which were presented for payment were dishonored by its bank because of insufficient funds in Milan's account.

In December of 1975 Milan provided Adell Trust with the financial information necessary to permit Adell Trust to file a financing statement as required by the Uniform Commercial Code.

In January, 1976, Milan transferred its inventory into the warehouse leased from the Adell Trust which had been renovated by Milan at a cost of $79,515 to Adell Trust.

In March, 1976, Adell Trust became aware that Milan had issued checks which had been dishonored for insufficient funds upon presentment. Confronting Danzig, the latter conceded the "credit" transactions. On March 29, 1976 Adell Trust ordered Lawrence to immediately impound all inventory until further notice. On that same date, Adell Trust withdrew all funds, $32,000, then deposited in the "lock box" depository account. Milan declared bankruptcy and the remaining inventory in the bonded warehouse was deposited with the trustee in bankruptcy at which point Lawrence was discharged. This inventory was subsequently sold by the trustee for approximately $950,000.

In June 1978, Adell Trust became aware that Pontiac Bank had been releasing funds from the "locked box" depository account to Milan without the requisite two signatures. Approximately $565,000 had been impermissibly withdrawn by Milan. Adell Trust thereupon initiated an action against Pontiac State Bank in state court.

Lawrence initiated the instant action seeking $4,564 for its services performed until March 29, 1975, on which date the warehouse inventory was sealed, and seeking $12,595 for securing the inventory from

March 29, 1975 until the inventory was surrendered to the trustee in bankruptcy on June 14, 1976. The district court initially issued judgment for Lawrence on both counts. The judgment was later amended to award only $12,595. The court adjudged that Lawrence had breached a fiduciary duty owed to Adell Trust and therefore was precluded from recovery under the Three Party Agreement.

Adell Trust counterclaimed, asserting (1) Lawrence had breached the Three Party Agreement by permitting credit purchases to be counted as "inventory" and by permitting sellers to receive a purchase money security interest in the inventory, (2) Lawrence had falsely represented that Milan possessed inventory valued at $1.1 million, and that such representation caused Adell Trust to consummate the loan with Milan, and (3) Lawrence had breached a fiduciary duty to inform Adell Trust of any facts that reflected an impairment of its security interest in the inventory, such as "credit" sales, and that Adell Trust's security interest was impaired by claims by other wineries and "credit" sellers. Adell Trust demanded $1.1 in damages on each claim. At trial, Adell Trust further sought the $79,515 expended to renovate the warehouse, $922,195 as interest on the defaulted loan from Adell Trust to Milan since 1976 computed at 18%; and $145,144 as interest paid to Pontiac Bank until June 20, 1978, on the $750,000 loan procured from Pontiac Bank by Adell Trust. Subsequent to the district court's judgment, Milan's bankruptcy proceeding was concluded and Adell Trust received $750,000. Adell Trust then paid Pontiac Bank the outstanding principal on its loan.

The district court adjudged that although the Three Party Agreement did not charge Lawrence with the responsibility of insuring cash payment for all incoming inventory, the conduct of Evinger as imputed to Lawrence constituted fraud and a breach of fiduciary duty:

Making sure that the inventory was paid for was outside the scope of the contractually defined duties owned by Lawrence to Adell under the terms of the three party agreement. It was, however, clearly within the understanding and contemplation of the parties that *payment for the wine in cash was an essential element of Adell's security.* By the nature of the duties defined in the three-party contract as well as by oral representations made by Lawrence to Adell while the three-party agreement was being negotiated, Lawrence was "the eyes and ears" of Adell inside the warehouse. The relationship between Adell and Lawrence, created by the contract and by the negotiations giving rise to it, was one of special trust and confidence upon which Adell had a right to and did rely. For Lawrence to have had knowledge that Milan was purchasing wine on credit in violation of Michigan law without revealing this information to Adell under the undisputed circumstances of this case would have been both fraudulent and a clear breach of a fiduciary duty.

Mary Lou Evinger, both prior to and after entry into the three-party contract, had knowledge that Milan was purchasing wine with floating checks. Throughout such period of time, she knew it was wrong. She participated in preparation of the inventory prior to the closing of the loan. At no time did she reveal such knowledge to Adell, or to anyone else connected with Lawrence. Adell would not have entered into the loan had Lawrence revealed such knowledge to Adell. Furthermore, had Lawrence revealed such knowledge to Adell at the time of closing or soon after the closing of the loan, Adell would have been alerted to take every possible action to avoid or minimize a loss.

On appeal, Lawrence challenges the district court's finding that fraud or a breach of fiduciary duty had been committed. Lawrence had no contractual obligation to assure that merchandise received into the inventory was free of liens and in compliance with Michigan law. Paragraph 2(B) states that the value of the inventory would be "computed at values declared by (Milan)". Paragraph 5 of the Three Party Agreement states that "Lawrence shall

have no responsibility or liability for ... title ... of the commodities on which it is reporting but shall be entitled to rely on [Milan's] representations thereto. * * * Lawrence shall have no responsibility for the validity of priority of [Adell Trust's] interest or for the values declared by [Milan] in computing the value of Inventory Certificates." Accordingly, although the district court did not so observe, Lawrence not only had no affirmative responsibility to guard against credit transactions, but Lawrence by the terms of the agreement was expressly relieved of such a responsibility.

Further, the district court adjudged that "Evinger, both prior to and after entry into the three party contract, had knowledge that Milan was purchasing wine with floating checks. * * * Her knowledge was attributable to Lawrence. Adell would not have entered into the loan had Lawrence revealed such knowledge to Adell." Accordingly, the district court adjudged that Evinger's knowledge prior to execution of the three-party contract and her failure to disclose that knowledge to Adell was a contributing factor in permitting Danzig to secure the $750,000 loan from Adell Trust on November 28, 1975. However, there is no evidence of record to indicate that Evinger participated either directly or indirectly in the pre-loan inventory certifications. Indeed, she did not become a bonded employee of Lawrence until December 1, 1975. Accordingly, Lawrence cannot be charged with any liability predicated upon Adell Trust's loan to Milan. Lawrence simply conducted a pre-loan inventory and represented, correctly, that the value of such inventory would exceed $1,100,000.

To the extent that Evinger may have possessed knowledge of credit transactions prior to the loan date of November 28, 1975, such knowledge could not have been imputed to Lawrence since Evinger's scope of duties, if any, did not include assuring that the inventory was free and clear of all claims. As Lawrence observes, "an employee's prior knowledge of a fact which is outside the scope of either his or her principal's duty to report should not be attributed to that employer, and certainly not before he or she is even employed." Citing *Restatement 2d of Agency,* § 275, Comment c (1958); *Schram v. Burt,* 111 F.2d 557 (6th Cir.1940); *Dawn Donut Co. v. Hart's Food Stores, Inc.,* 267 F.2d 358, 363 (2d Cir.1959).

Lawrence additionally urges that no fraud or breach of fiduciary duty occurred prior to the closing date of the loan since Adell Trust was aware of Milan's possession of the $750,000 inventory of wine on credit from United Beverages in violation of Michigan law. The record demonstrates that Danzig disclosed his illegal conduct to Robert Adell. Lawrence argues that to the extent that fraud or breach of a fiduciary duty is predicated upon failure to disclose to Adell Trust that Milan was floating checks and purchasing wine on credit, Milan's practice of engaging in illegal transactions was within the knowledge of Adell Trust and "failure to tell the trust what it already knew is not fraud." *Wheeler v. Martin,* 364 Mich. 41, 110 N.W.2d 635 (1961); *Schuler v. American Motors Sales Corp.,* 39 Mich.App. 276, 197 N.W.2d 493 (1972).

Lawrence's argument is persuasive. The earliest that Lawrence could have become liable for fraud or breach of a fiduciary duty arising from Evinger's knowledge of Milan's credit transactions was December 1, 1975. Accordingly, Lawrence could not be held liable for any damages sustained by Adell Trust as a result of having loaned $750,000 to Milan.

Lawrence further posits that no fraud or breach of a fiduciary duty occurred subsequent to December 1, 1975, the date upon which Evinger became a bonded employee. Pertinently, the district court failed to adjudge that Evinger had engaged in improper or illegal conduct but rather, adjudged only that Evinger "had knowledge that Milan was purchasing wine with floating checks" and "did [not] reveal such knowledge to Adell, or to anyone else connected with Lawrence." It was further adjudged that such knowledge was attributable to Lawrence whose failure to convey such knowledge to Adell Trust constituted fraud since "payment for the wine in cash was an

essential element of Adell's security" and "[t]he relationship between Adell and Lawrence ... was one of special trust and confidence upon which Adell had a right to and did rely."

Lawrence submits that Evinger's knowledge was not attributable to it since the scope of her duties did not include certifying that incoming merchandise had been paid for in cash. It is contended that an employee's knowledge of a fact which is outside the employee's scope of employment and outside of the employee's duty to disclose to the employer may not be legally attributable to the employer.

To the extent that Lawrence was charged with a duty to assure that only fully paid merchandise was accepted into inventory, Evinger's knowledge of credit transaction was attributable to Lawrence. No Lawrence employee was in a better position to identify a credit transaction than Evinger, the very individual who certified the inventory.

The pertinent inquiry, therefore, is whether Lawrence was charged with a duty to assure that only fully paid merchandise was accepted into inventory and charged with a duty to notify Adell Trust in the event that credit inventory was improperly co-mingled with the existing inventory. Although the district court concluded that "payment for the wine in cash was an essential element of Adell's security", the Three Party Agreement expressly relieved Lawrence of responsibility for assuring that the wine had been paid for in full. Further, the district court adjudged that the relationship between Adell Trust and Lawrence was "one of special trust and confidence upon which Adell had a right to and did rely." However, it is obvious that Adell Trust could not have imposed "trust and confidence" in Lawrence to perform a duty which had been expressly excluded from its contractual undertaking.

Lawrence's primary responsibilities to Adell Trust, as detailed in the Three Party Agreement, were to maintain accurate records concerning the amount of inventory and to release merchandise from the inventory in accordance with the instructions and safeguards specified by Adell Trust. These services were fully performed. Moreover, to the extent that credit merchandise was accepted into inventory, such merchandise actually appreciated the inventory and Adell Trust's security for the $750,000 loan. Had the "credit" merchandise been rejected, it would not have become subject to Adell Trust's priority lien resulting from its financing statement of record.

In sum, it is concluded that (1) no fraud or breach of a fiduciary duty occurred prior to December 1, 1975, since Evinger had not become an employee bonded or otherwise until said date, and (2) no fraud or breach of a fiduciary duty occurred subsequent to December 1, 1975, since neither Evinger, nor Lawrence, was charged with the responsibility of rejecting credit inventory. The district court is therefore REVERSED to the extent it adjudged that fraud had been perpetrated by Lawrence.

The district court decided that Lawrence had perpetrated fraud and breach of fiduciary duty. However, it further adjudged that Adell Trust had "failed to prove *any* loss by reason of such fraudulent conduct or breach of the fiduciary relationship" and denied Adell Trust's counterclaim for damages. Adell Trust's security, the district court determined, had not been impaired because: (1) Adell Trust appeared to possess a primary security interest in the inventory through filing of a financing statement and would therefore have prevailed over other lienholders on the inventory (*i.e.* the "credit" sellers) in the pending bankruptcy proceeding wherein the trustee in bankruptcy held over $950,000; (2) Adell Trust could recover from Community National Bank of Pontiac for the improper withdrawals made by Milan from the special "lock box" depository account, which withdrawals Pontiac Bank knowingly permitted without the requisite two signators; (3) Milan Wineries could voluntarily make payment to Adell Trust; and (4) Adell Trust could have foreclosed upon the mortgages it held on Milan's real estate and wineries.

Subsequent to the district court's judgment, Adell Trust received $750,000 from the trustee in bankruptcy thereby fully re-

alizing the return of the entire principal of the loan due and owing from Milan.

On appeal, Adell Trust submits that the existence of alternate methods of recovery, none of which Adell Trust was legally mandated to pursue, should not serve to preclude recovery of damages from Lawrence upon a finding of fraud and breach of a fiduciary duty. The district court observed:

> [H]ad Lawrence revealed such knowledge to Adell at the time of closing or soon after the closing of the loan, Adell would have been alerted to take every possible action to avoid or minimize a loss.
>
> Adell might have seized the inventory, it might have filed a financing statement promptly, and it might have commenced litigation to prevent a further disbursement or loss of the loan proceeds. The Court is not able to make a determination as to what effect, if any, such steps would have had on the issues presently litigated in this court and in the bankruptcy court.

Adell Trust avers that all losses which could have been minimized should be recoverable. Various Michigan authorities are cited in support of the proposition that an inability to calculate damages with certainty does not bar recovery of damages. While this legal postulation is correct, it is inapplicable since the district court adjudged that Adell Trust had "failed to prove *any* loss". On appeal Adell Trust has failed to demonstrate the manner in which Lawrence's alleged breach of fiduciary duty proximately caused the various damages charged. Further, most of Adell Trust's "damage" claims presuppose that Lawrence's alleged fraud contributed to the consummation of the $750,000 loan to Milan. The record discloses no fraud could have been attributable to Lawrence before December 1, 1975, at which time the loan agreement had already been consummated. Accordingly, damages envisioned by the district court as "minimizing a loss" were not recoverable. The district court improperly adjudged that "Had Lawrence revealed such knowledge to Adell at the time of closing ... Adell would have been alerted to take every possible action to avoid or minimize a loss."

Adell Trust's counterclaims against Lawrence were properly dismissed by the district court and the judgment is AFFIRMED as to those counts.

Lawrence impounded the inventory on March 29, 1976, upon order of Adell Trust. On June 14, 1978, the inventory was conveyed to Milan's trustee in bankruptcy. The parties stipulated prior to trial that the value of said services was $12,595, which amount the district court awarded to Lawrence. On appeal, Adell Trust maintains that it had not discovered Evinger's (and Lawrence's) fraudulent conduct until Evinger testified at the bankruptcy trial and that had Adell Trust known on March 29, 1976 that Lawrence had perpetrated fraud, then Adell Trust would have engaged an alternate security company to guard the inventory. It is further submitted that said services provided by Lawrence in guarding the inventory during the period in issue were distinct from its bonded warehouse inventory control as detailed in the Three Party Agreement. The services performed by Lawrence subsequent to March 29, 1976 were viewed by Adell Trust as a separate undertaking which would not have been necessary but for Lawrence's initial breach of a fiduciary duty. Therefore, Adell Trust submits, Lawrence should not be permitted to profit by its own wrongdoing.

Lawrence fully performed the services requested by Adell Trust. Adell Trust has offered no authority in support of the proposition that a contract may be voided or compensation withheld simply because one of the contracting parties might have contracted with a different party had the contracting party been in possession of certain information at the time that the contract was executed. The district court, in the first instance, properly adjudged that Lawrence was entitled to $12,595 for services rendered after March 29, 1976.

Although the district court initially awarded Lawrence $4,564 for services of inventory control rendered until March 29, 1976, judgment was subsequently amended to exclude said amount:

> [I]t is the opinion of this Court that the prior finding of breach of fiduciary duty on the part of Lawrence Systems pre-

clude Lawrence Systems from recovering [$4,564] for services rendered under the two-party and three-party agreements.

Since no breach of fiduciary duty may be attributed to Lawrence prior to the employment of Evinger on December 1, 1976, Lawrence is clearly entitled to compensation for services rendered until such date.

Further, Lawrence did not breach a fiduciary duty subsequent to December 1, 1976, because neither Lawrence nor Evinger was charged with a legal responsibility to prevent co-mingling of "credit" inventory; rather, the three party agreement expressly disclaimed such a responsibility.

Accordingly, the judgment of the district court is AFFIRMED to the extent of its award of $12,595 to Lawrence for services rendered from March 29, 1976 to June 14, 1976, and as to the dismissal of Adell Trust's counterclaim. The judgment of the district court is REVERSED to the extent that it denied an award of $4,564 to Lawrence for services rendered prior to March 29, 1976, and this case is REMANDED with directions to reinstitute the award of such damages.